10-3247-cv
Jock et al. v. Sterling Jewelers Inc.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: February 9, 2011                    Decided: July 1, 2011)

Docket No. 10-3247-cv

_____

LARYSSA JOCK, CHRISTY CHADWICK, MARIA HOUSE, DENISE MADDOX, LISA MCCONNELL, GLORIA PAGAN, JUDY REED, LINDA RHODES, NINA SHAHMIRZADI, LEIGHLA SMITH, MARIE WOLF, DAWN SOUTO-COONS, and all others similarly situated,

*Plaintiffs-Counter-Defendants-Appellants*,

JACQUELYN BOYLE, LISA FOLLETT, KHRISTINA RODRIGUEZ, KELLY CONTRERAS,

*Plaintiffs-Counter-Defendants,*

— v.—

STERLING JEWELERS INC.

*Defendant-Counter-Claimant-Appellee*.

_____

Before:

WINTER, POOLER, and HALL, *Circuit Judges*.

_____

Plaintiffs, a group of retail sales employees of defendant Sterling Jewelers, Inc.'s national

jewelry chain stores, appeal from an order of the United States District Court for the Southern

District of New York (Rakoff, *J.*) vacating an arbitration award on the ground that the arbitrator had exceeded her authority in light of the Supreme Court's decision in *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, __ U.S. __, 130 S. Ct. 1758 (2010). We hold that the district court, rather than examining whether the arbitrator had exceeded her authority under the precedent of this circuit, improperly substituted its own interpretation of the parties' arbitration agreement for that of the arbitrator's to conclude that the arbitrator had reached an incorrect determination that the parties' arbitration agreement did not prohibit class arbitration. We, therefore, reverse the judgment of the district court vacating the arbitration award and remand with instructions to confirm the award.

REVERSED AND REMANDED.

Judge Winter dissents in a separate opinion.

—————————————

JOSEPH M. SELLERS, Cohen, Milstein, Sellers & Toll PLLC, Washington, DC, (Jenny R. Yang and Kalpana Kotagal, Cohen, Milstein, Sellers & Toll PLLC, Thomas Warren, Thomas A. Warren Law Offices, P.L., and Sam Smith, Burr & Smith, LLP *on the brief*) *for Plaintiffs-Counter-Defendants-Appellants.*

GERALD L. MAATMAN, JR., Seyfarth Shaw LLP, New York, NY, (David Bennet Ross and Daniel B. Klein, Seyfarth Shaw LLP, and Stephen S. Zashin, Zashin & Rich Co., L.P.A., *on the brief*) *for Defendant-Counter-Claimant-Appellee*.

—————————————

HALL, *Circuit Judge*:

Plaintiffs, a group of retail sales employees of defendant Sterling Jewelers, Inc.'s national jewelry chain stores, appeal from an order of the United States District Court for the Southern District of New York (Rakoff, *J.*) vacating an arbitration award on the ground that the arbitrator

2

had exceeded her authority in light of the Supreme Court's decision in *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.*, __ U.S. __, 130 S. Ct. 1758 (2010). The issue presented by this appeal is whether a district court has the authority to vacate an arbitration award where it believes that the arbitrator improperly interpreted the terms of an arbitration agreement. Because the district court did not undertake the appropriate inquiry—whether, based on the parties' submissions or the arbitration agreement, the arbitrator had the authority to reach an issue, not whether the arbitrator decided the issue correctly—and instead substituted its own legal analysis for that of the arbitrator's, we reverse the judgment of the district court. Because we find that the arbitrator acted within her authority to reach an issue properly submitted to her by the parties and reached her decision by analyzing the terms of the agreement in light of applicable law, the award should not have been vacated. We remand with instructions to confirm the award.

## I.    Background

In May 2005, plaintiff Laryssa Jock filed a discrimination suit with the Equal Employment Opportunity Commission ("EEOC") against her employer Sterling Jewelers, Inc. ("Sterling"), alleging that she and other female workers were being paid less because of their gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000(e) *et seq.*, and the Equal Pay Act, 29 U.S.C. § 206(d). Eighteen other female employees filed charges against Sterling before the EEOC. Jock and the other employees simultaneously initiated dispute resolution procedures pursuant to their employment contract, which mandated a three-step alternative dispute resolution program, known as RESOLVE. Step One of the RESOLVE program requires the employee to notify Sterling of her complaint in writing, and include references to any supporting evidence. Sterling then makes a determination with respect to the

3

merits of the complaint. If the employee is dissatisfied with Sterling's determination, she may then initiate Step Two, which calls for referring the claim to a mediator or a panel of employees, both of which are determined by Sterling. If the employee remains dissatisfied, in Step Three she may request arbitration, which is to be conducted in accordance with the rules of the American Arbitration Association ("AAA"). Agreeing to the RESOLVE dispute resolution process is a mandatory condition of employment.

In January 2008, the EEOC issued its letter of determination, finding reasonable cause to believe that Sterling had violated Title VII and the Equal Pay Act. According to its letter, the EEOC's "investigation determined that [Sterling] subjected [plaintiffs-appellants] and a class of female employees with retail sales responsibilities nationwide to a pattern or practice of sex discrimination in regard to promotion and compensation." The letter goes on to state that "[s]tatistical analysis of pay and promotion data . . . reveals that [Sterling] promoted male employees at a statistically significant, higher rate than similarly situated female employees and that [Sterling] compensated male employees at a statistically significant, higher rate than similarly situated female employees."

Following the EEOC's determination, in March 2008, Jock and the other plaintiffs-appellants (collectively, the "plaintiffs") filed a class action suit in the United States District Court for the Southern District of New York on behalf of themselves and others similarly situated, and asserting claims under Title VII, the Equal Pay Act, and the Age Discrimination in Employment Act, alleging that Sterling's discriminatory promotion and compensation policies denied promotional opportunities to qualified female employees and paid female employees less than male employees performing the same work. That same month, the plaintiffs filed a class

4

arbitration complaint with the AAA, making the same allegations and challenging the same practices. After Sterling addressed several of the plaintiffs' concerns, they moved to stay their federal court litigation in favor of the arbitration. In September 2008, the EEOC filed a parallel action against Sterling in the United States District Court for the Western District of New York.

### III.  Procedural History

On June 18, 2008, over Sterling's objection, the district court granted the plaintiffs' motion to refer the matter to arbitration and stay the litigation. The parties submitted to the arbitrator the question whether the RESOLVE agreement permitted or prohibited class arbitration. In its clause construction brief, Sterling asked the arbitrator to "find . . . [t]hat RESOLVE does not allow for class arbitration." The plaintiffs conversely asked the arbitrator to "find that the RESOLVE Arbitration Agreements at issue permit class arbitration." On June 1, 2009, the arbitrator found in favor of the plaintiffs, issuing a "Clause Construction Award" (the "award") holding that the RESOLVE arbitration agreements "cannot be construed to prohibit class arbitration." In undertaking her analysis, the arbitrator began by quoting the language of the arbitration provision at issue:

> I hereby utilize the Sterling RESOLVE program to pursue any dispute, claim, or controversy ("claim") against Sterling . . . regarding any alleged unlawful act regarding my employment or termination of my employment which could have otherwise been brought before an appropriate government or administrative agency or in a [sic] appropriate court, including but not limited to, claims under . . . Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1991, . . . the Fair Labor Standards Act. . .. I understand that by signing this Agreement I am waiving my right to obtain legal or equitable relief (e.g. monetary, injunctive or reinstatement) through any government agency or court, and I am also waiving my right to commence any court action. I may, however, seek and be awarded equal remedy through the RESOLVE program.
>
> ***

5

> The Arbitrator shall have the power to award any types of legal or equitable relief that would be available in a court of competent jurisdiction including, but not limited to, the costs of arbitration, attorney fees and punitive damages for causes of action when such damages are available under law.

The arbitrator noted that there was no express prohibition on the pursuit of class claims and that "indeed, there is no mention of class claims." The arbitrator stated that "[u]nder Ohio law, contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." Construing the agreement in accordance with Ohio law, as required by the terms of the agreement, the arbitrator determined she would not read into the agreement an intent to prohibit class claims because "'[t]he law will not insert by construction for the benefit of one of the parties an exception or condition which the parties either by design or neglect have omitted from their own contract.'" (quoting *Montgomery v. Bd. of Educ. of Liberty Township, Union Cty.*, 102 Ohio St. 189, 193 (1921)).

In other words, the arbitrator construed the absence of an express prohibition on class claims against the contract's drafter, Sterling. Noting that the issue of intent was "problematic in the context of a contract of adhesion," the arbitrator held that "[b]ecause this contract was drafted by Sterling and was not the product of negotiation, it was incumbent on Sterling to ensure that all material terms, especially those adverse to the employee, were clearly expressed." In her analysis of the agreement, the arbitrator noted that Sterling acknowledged it had deliberately chosen not to revise the RESOLVE contract despite several arbitral decisions permitting class claims in the absence of an express prohibition. She reasoned that to read a prohibition on class arbitration into the terms of the agreement "would impermissibly insert a term for the benefit of one of the parties that it has chosen to omit from its own contract." (citing *Montgomery*, 102 Ohio St. at 193). Noting that the agreement expressly gave the arbitrator the

6

"power to award any types of legal or equitable relief that would be available in a court of competent jurisdiction," the arbitrator determined that merely agreeing to the RESOLVE step process could not constitute a waiver of the employee's right to participate in a collective action. Finally, she concluded that "[t]he RESOLVE arbitration agreements cannot be construed to prohibit class arbitration," which thus permitted the plaintiffs to proceed with an effort to pursue their claims on a class-wide basis. The arbitrator allowed the parties to move in the district court to confirm or vacate that determination.

On June 30, 2009, Sterling moved in the district court case to vacate the arbitration award. On August 31, 2009, the district court denied the motion to vacate the award, laying out its reasoning in an opinion dated December 28, 2009. In that opinion, the district court decided as a preliminary matter that the motion was ripe for consideration despite the fact that the arbitrator had not yet certified a class. It went on to hold that the arbitrator had not exceeded her powers by reaching the issue whether the arbitration agreements prohibited class certification and that the decision was not made in manifest disregard of the law, citing the Second Circuit's decision in *Stolt-Nielsen SA v. Animalfeeds International Corp.*, 548 F.3d 85, 99 (2d Cir. 2008). The court declined to stay its order pending the outcome of the Supreme Court's decision in *Stolt-Nielsen*.

On January 26, 2010, Sterling appealed the district court's order denying its motion to vacate the award or, in the alternative, stay the arbitration. Three months later, the Supreme Court issued its decision in *Stolt-Nielsen*, and on May 13, 2010, Sterling moved pursuant to Federal Rules of Civil Procedure 62.1 and 60(b) in the district court for relief from its December

7

28, 2009 order. The appeal to this court was held in abeyance pending the outcome of the district court's decision on that motion.

On July 27, 2010, the district court issued a ruling holding that, if jurisdiction was restored to it, it would reconsider its December 28, 2009 order and vacate the arbitrator's award that permitted the plaintiffs to pursue class certification. *Jock v. Sterling Jewelers, Inc.*, 725 F. Supp. 2d 444, 450 (S.D.N.Y. 2010). The district court concluded that in light of the Supreme Court's decision in *Stolt-Nielsen v. Animalfeeds International Corp.*, 130 S. Ct. 1758 (2010), "the arbitrator's construction of the RESOLVE agreements as permitting class certification was in excess of her powers and therefore cannot be upheld." *Jock*, 725 F. Supp. 2d at 448. The district court first held that the arbitrator's approach—determining whether there was any indication of an intent to preclude class arbitration—"was plainly incompatible with the Supreme Court's subsequent pronouncements in *Stolt-Nielsen*." *Id.* Then, addressing the issue whether the record "evince[d] the parties' shared intent to permit class arbitration," the court found the record devoid of any indication that the parties intended to permit arbitration of class claims. *Id.* Although the district court conceded that *Stolt-Nielsen* "does not foreclose the possibility that parties may reach an 'implicit'—rather than express—'agreement to authorize class-action arbitration,'" it held that "the record here provides no support for such an implied agreement." *Id.* at 449 (quoting *Stolt-Nielsen*, 130 S. Ct. at 1775). In so ruling, the district court determined that *Stolt-Nielsen* was not distinguishable on the facts. *Id.* at 449-50.

On August 3, 2010, this court issued a limited remand of the appeal to permit the district court to rule on the pending Rule 60(b) motion. Six days later, the district court officially

8

granted Sterling's motion to vacate the arbitrator's award permitting class arbitration to proceed. Plaintiffs timely appealed that ruling.

**III.    Discussion**

Appellate jurisdiction is based on the Federal Arbitration Act, 9 U.S.C. § 16(a)(1)(E) ("An appeal may be taken from . . . an order . . . vacating an award."). "In considering a challenge to a district court's decision to vacate a portion of an arbitration award, we review its legal rulings *de novo* and its findings of fact for clear error." *ReliaStar Life Ins. Co. of New York v. EMC Nat'l Life Co.*, 564 F.3d 81, 85 (2d Cir. 2009).

A.    Supreme Court's Decision in *Stolt-Nielsen*

The dispute in *Stolt-Nielsen* arose out of a Department of Justice investigation that revealed the petitioner, a shipping company, was engaging in an illegal price-fixing conspiracy. *Stolt-Nielsen*, 130 S. Ct. at 1765. The respondent, a shipping customer, brought a putative class action asserting antitrust claims for supracompetitive prices that the shipping company had been charging its customers over the course of several years. *Id.* The Multidistrict Litigation Panel eventually consolidated that case with other similar cases; the parties agreed that, as a consequence of judgments and orders arising out of that MDL case, they had to arbitrate their antitrust dispute. *Id.* The respondent subsequently served the petitioner with a demand for class arbitration. *Id.*

The parties then entered into a supplemental agreement that the question of class arbitration was to be submitted to a panel of three arbitrators. *Id.* The parties stipulated that the arbitration clause was "silent" with respect to class arbitration. *Id.* at 1766. After hearing argument and taking evidence from the parties, including expert testimony on the customs and

9

usage in the maritime trade, the arbitration panel concluded that the arbitration clause allowed for class arbitration. *Id.* The arbitration panel stayed its decision to permit the parties to seek judicial review. The petitioners filed an application to vacate the award in the United States District Court for the Southern District of New York. *Id.*

The district court vacated the award on the ground that the arbitrators had acted in manifest disregard of the law because they failed to conduct a choice-of-law analysis. *Id.* This court reversed, concluding that the decision was not in manifest disregard of the law because the petitioner had not cited any authority applying a federal maritime rule of custom and usage against class arbitration and because there was nothing in New York law that established a rule against class arbitration. *Id.* at 1766-67.

The Supreme Court granted *certiorari* to decide the question "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the [FAA]." *Id.* at 1764. The five-member majority first noted that "an arbitration decision may be vacated under § 10(a)(4) of the FAA on the ground that the arbitrator 'exceeded his powers,' for the task of an arbitrator is to interpret and enforce a contract, not to make public policy." *Id.* at 1767. Of significance to the majority was that the arbitration panel "appears to have rested its decision on [a] public policy argument." *Id.* at 1768. *See also AT&T Mobility LLC v. Concepcion*, __ U.S. __, 131 S. Ct. 1740, 1750 (2011) (noting that in *Stolt-Nielsen* "we held that an arbitration panel exceeded its power under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation"). The *Stolt-Nielsen* Court admonished that "[b]ecause the parties agreed their agreement was 'silent' in the sense

10

that they had not reached any agreement on the issue of class arbitration, the arbitrators' proper task was to identify the rule of law that governs in that situation," hypothesizing that the FAA, federal maritime law, or New York would provide the governing rule. 130 S. Ct. at 1768. The Court reiterated that, in light of the parties' stipulation that they were "in complete agreement regarding their intent," i.e., that their arbitration agreement contained "no agreement" on the issue of class arbitration,"the only task left for the panel . . . was to identify the governing rule applicable in a case in which neither the language of the contract nor any other evidence established that the parties had reached any agreement on the question of class arbitration." *Id.* at 1768, 1770. Because the arbitration panel failed to follow this approach, the Supreme Court concluded that it had "exceeded its powers" when it "imposed its own policy choice" rather than engaging in its required "task" of "interpret[ing] and enforc[ing] a contract," "identifying and applying a rule of decision derived from the FAA or either maritime or New York law," and "giv[ing] effect to the intent of the parties." *Id.* at 1767-68, 1770, 1774-75.

The Court's interpretation of the parties' "silence" is key. Our dissenting colleague states that he believes the "silence" in *Stolt-Nielsen* was interpreted as "simply reflect[ing] the fact each party recognized the arbitration clause neither specifically authorized nor specifically prohibited class arbitration." Dissenting Op. at 1-2 (citing Brief for Respondent at 26, *Stolt-Nielsen*, 2009 WL 3404244, at *26). The dissent, however, fails to acknowledge that although that is the interpretation that the Respondent in *Stolt-Nielsen wished* the Court to adopt, that is not the interpretation that the Court *did* adopt. To the contrary, the Court interpreted the stipulated silence to mean that "the parties agreed their agreement was 'silent' in the sense that they had not reached any agreement on the issue of class arbitration." *Stolt-Nielsen*, 130 S. Ct. at

11

1768. *See also id.* at 1766 ("The parties . . . stipulated that the arbitration clause was 'silent' with respect to class arbitration. Counsel for [the Respondent] explained to the arbitration panel that the term 'silent' did not simply mean that the clause made no express reference to class arbitration. Rather, he said, '[a]ll the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on the issue.'"). The Court further noted that "parties were in complete agreement regarding their intent." *Id.* at 1770. That is to say, according to the majority in *Stolt-Nielsen*, there was no express *or implicit* intent to submit to class arbitration. Indeed, the dissent in *Stolt-Nielsen* pointed out that the majority's interpretation of "silence" was incongruous with the Respondent's interpretation. *Id.* at 1781 (Ginsburg, *J.*, *dissenting*) (noting the majority's failure to acknowledge that counsel for the Respondent clarified his quoted statement to say that "[i]t's also undisputed that the arbitration clause here contains broad language and this language should be interpreted to permit class arbitration"). Although the dissent here appears to agree with Justice Ginsburg's interpretation of the parties' stipulated "silence" in *Stolt-Nielsen*, significantly for purposes of this case, that was not the interpretation adopted by the majority.

Turning back to *Stolt-Nielsen*, the Court then took on the task of answering the question left open by *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444 (2003): "establish[ing] the rule to be applied in deciding whether class arbitration is permitted." *Stolt-Nielsen*, 130 S. Ct. at 1772. Acknowledging that although "interpretation of an arbitration agreement is generally a matter of state law, the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'" *Id.* at 1773 (quoting *Volt Information Sciences, Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 479

12

(1989)).  The Court emphasized the "consensual nature of private dispute resolution," noting that "parties are generally free to structure their arbitration agreements as they see fit" and that "parties may specify *with whom* they choose to arbitrate their disputes."  *Id.* at 1774 (internal quotation marks omitted) (emphasis in original).  Accordingly, because the primary purpose when enforcing arbitration agreements is "to give effect to the intent of the parties," the Court concluded that "it follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so."  *Id.* at 1775.  Significantly, the *Stolt-Nielsen* Court was concerned that the arbitration panel had imposed class arbitration despite the parties' explicit stipulation that "they had reached 'no agreement' on that issue," i.e., that they had stipulated that the arbitration agreement contained neither an explicit nor implicit intent regarding class arbitration.  *Id.*

It is equally important to note that the Court declined to hold that an arbitration agreement must *expressly* state that the parties agree to class arbitration—"[w]e have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class arbitration"—because in the case before them, "the parties stipulated that there was 'no agreement' on the issue of class-action arbitration."  *Id.* at 1776 n.10.  The Court contemplated that an arbitration agreement may contain an implicit agreement to authorize class arbitration, but an "implicit" agreement to authorize class arbitration may not be "infer[red] solely from the fact of the parties' agreement to arbitrate." *Id.* at 1775.  In other words, simply agreeing to submit the dispute to an arbitrator does not equal an agreement to class-action arbitration.  "[M]ere silence" on the issue of class arbitration, therefore, cannot give rise to "consent to resolve . . . disputes in class proceedings."  *Id.* at 1776.  Thus, the Court saw "the

13

question as being whether the parties *agreed to authorize* class arbitration" and held that "where the parties stipulated that there was 'no agreement' on this question, it follows that the parties cannot be compelled to submit their dispute to class arbitration." *Id.* (emphasis in original).

B.      District Court's Authority to Vacate Award

The Federal Arbitration Act ("FAA") sets forth specific grounds for vacating arbitration awards. 9 U.S.C. § 10(a). Grounds for vacating an award under section 10(a) are: "corruption, fraud, or undue means in procurement of the award, evident partiality or corruption in the arbitrators, specified misconduct on the arbitrators' part, or 'where the arbitrators exceeded their powers.'" *Wall Street Assocs., L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 848 (2d Cir. 1994) (quoting 9 U.S.C. § 10(a)). Because the FAA supports a "strong presumption in favor of enforcing arbitration awards . . . the policy of the FAA requires that the award be enforced unless one of those grounds is affirmatively shown to exist." *Id.* at 849. In addition to the section 10(a) grounds for vacatur, we have recognized a judicially-created ground, namely that "an arbitral decision may be vacated when an arbitrator has exhibited a manifest disregard of law."[1]

---

[1] To vacate an award on the basis of a manifest disregard of the law, the court must find "something beyond and different from mere error in the law or failure on the part of the arbitrators to understand or apply the law." *Westerbeke*, 304 F.3d at 208. (internal quotation marks omitted). The two part showing requires the court to consider, first, "whether the governing law alleged to have been ignored by the arbitrators was well defined, explicit, and clearly applicable," and, second, whether the arbitrator knew about "the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it." *Id.* at 209 (internal quotations and alterations omitted). *See also STMicroelectronics, N.V. v. Credit Suisse Securities (USA) LLC,* No. 10-3847-cv, slip op. at 18 (2d Cir. June 2, 2011) ("We therefore will not vacate an award because of 'a simple error in law or a failure by the arbitrators to understand or apply it' but only when a party clearly demonstrates 'that the panel intentionally defied the law.'") (quoting *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir. 2003)). Here, the district court did not base its vacatur order on the manifest disregard of law doctrine, *Jock*, 725 F. Supp. 2d at 448 n.4, and, at any rate, it is clearly not applicable to this case where this circuit's decision in *Stolt-Nielsen* was controlling at the time and the Supreme

14

*Westerbeke Corp. v. Daihatsu Motor Co.*, 304 F.3d 200, 208 (2d Cir. 2002) (internal quotation marks omitted); *Porzig v. Dresdner, Kleinwort, Benson, North America LLC*, 497 F.3d 133,139 (2d Cir. 2007).

"We have . . . 'consistently accorded the narrowest of readings'" to section 10(a)(4) permitting vacatur where the arbitrator has exceeded her powers. *Reliastar*, 564 F.3d at 85 (quoting *Banco de Seguros del Estado v. Mut. Marine Office, Inc.*, 344 F.3d 255, 262 (2d Cir. 2003)); *Westerbeke*, 304 F.3d at 220. This is "especially" true when section 10(a)(4) is invoked to challenge an award deciding "a question which all concede to have been properly submitted in the first instance." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 824 (2d Cir. 1997) (quoting *Fahnestock & Co. v. Waltman*, 935 F.2d 512, 515 (2d Cir. 1991)). The focus of our inquiry in challenges to an arbitration award under section 10(a)(4) is "whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, *not whether the arbitrators correctly decided that issue*." *Id.* (emphasis added); *Westerbeke*, 304 F.3d at 220. Put simply, "[s]ection 10(a)(4) does not permit vacatur for legal errors." *Westerbeke*, 304 F.3d at 220. If the "arbitrator's award draws its essence from the agreement to arbitrate," then "the scope of the court's review of the award itself is limited. Notably, *we do not consider whether the arbitrators correctly decided the issue*." *Reliastar*, 564 F.3d at 86 (internal quotation marks and alterations omitted) (emphasis added). We will uphold

---

Court's decision in that case was issued a year after the arbitrator's award. On page 10 of the dissent, our colleague states that the arbitrator "exceeded her authority by manifestly disregarding explicit provisions of the agreement inconsistent with class arbitration." Respectfully, the dissent has conflated two separate grounds for vacatur, which are independent of each other and do not overlap. As we have already pointed out, whether an arbitrator exceeds her authority or manifestly disregards the law carry requires a reviewing court to undertake two different inquiries for determining whether vacatur is appropriate.

an award so long as the arbitrator "offers a barely colorable justification for the outcome reached." *Id.* (internal quotation marks omitted). As the Supreme Court emphasized in *Stolt-Nielsen*, vacating an arbitration award requires the moving party to "clear a high hurdle," and "[i]t is not enough . . . to show that the panel committed an error—or even a serious error. It is only when an arbitrator strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice that his decision may be unenforceable." 130 S. Ct. at 1767 (internal quotation marks, citations, and alterations omitted). "In other words, as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, a court's conviction that the arbitrator has committed serious error in resolving the disputed issue does not suffice to overturn his decision." *Reliastar*, 564 F.3d at 86 (internal quotation marks omitted).

Accordingly, an arbitrator may exceed her authority by, first, considering issues beyond those the parties have submitted for her consideration, or, second, reaching issues clearly prohibited by law or by the terms of the parties' agreement. For example, in *Westerbeke*, 304 F.3d at 220, we drew a distinction between two situations. One is where the law or the parties' agreement categorically prohibits the arbitrator from reaching an issue so that, in reaching that issue, the arbitrator exceeds her authority. *Id.* (citing *Fahnestock,* 935 F.2d at 519 (vacating an arbitration award imposing punitive damages where New York law expressly prohibited arbitrators from imposing punitive damages) and *Katz v. Feinberg*, 290 F.3d 95, 97-98 (2d Cir. 2002) (holding that the arbitrators had exceeded their authority by reaching an issue that the agreement exclusively committed to independent accountants, not the arbitrators)). The other is a situation where the parties grant the arbitrator the authority to determine an issue, but the

16

arbitrator makes an error of law in deciding that issue. *Id.* (citing *DiRussa*, 121 F.3d at 824 (confirming an award denying attorneys' fees for a party that successfully established a violation of the Age Discrimination in Employment Act, which required a statutory award of attorneys' fees). Concluding that the parties were contesting whether the arbitrator properly interpreted New York law regarding the award of expectancy damages, not whether the arbitrator had the authority to award such damages generally, the court in *Westerbeke* held that the award could not be vacated under section 10(a)(4) despite the fact that such damages might be precluded by New York law. 304 F.3d at 220. In other words, the arbitrator may well have committed an error of law, but in doing so she was rendering a decision the parties authorized her to make and thus did not exceed her authority in making the determination.

The threshold issues for the district court to consider in this case when deciding whether it was appropriate to vacate the award pursuant to section 10(a)(4) was, first, whether the parties had submitted to the arbitrator the question of whether their arbitration agreement permitted class arbitration and, second, whether the agreement or the law categorically prohibited the arbitrator from reaching that issue. The district court, however, appears not to have considered the "high hurdle" that vacating an award under section 10(a)(4) requires but to have proceeded instead to engage in a substantive review of the arbitrator's decision, holding that "in light of *Stolt-Nielsen*, . . . the arbitrator's construction of the RESOLVE agreements as permitting class arbitration was in excess of her powers and therefore cannot be upheld." In substance, while articulating a rationale that purported to examine whether the arbitrator exceeded her authority, the district court's analysis focused in fact on whether the arbitrator had correctly interpreted the arbitration agreement itself. This was error.

17

The district court seems to have taken the plaintiffs' concession that the agreement lacked an explicit authorization permitting class arbitration as a concession that the agreement did not manifest even an implicit intent to permit class arbitration. *Jock*, 725 F. Supp. 2d at 448. The plaintiffs' concession that there was no explicit agreement to permit class arbitration, however, is not the same thing as stipulating that the parties had reached no agreement on the issue. Nor is it the same as stipulating that the agreement is "silent" on the issue of class arbitration in the sense that "silent" was used by the *Stolt-Nielsen* majority. As the district court correctly acknowledged, "*Stolt-Nielsen* does not foreclose the possibility that parties may reach an 'implicit'—rather than express—'agreement to authorize class-action arbitration.'" *Id.* at 449 (quoting *Stolt-Nielsen*, 130 S. Ct. at 1775). Where the district court strayed was in substituting its interpretation of the agreement for that already undertaken by the arbitrator when she performed the legal analysis she was asked by the parties to undertake. When the district court did so, it determined that nothing in the record supported any implied agreement to permit arbitration, but this was an issue the arbitrator had already considered and decided differently. *Id.*

Under our precedent it is not for the district court to decide whether the arbitrator "got it right" when the question has been properly submitted to the arbitrator and neither the law nor the agreement categorically bar her from deciding that issue. *Reliastar*, 564 F.3d at 85-86; *Westerbeke*, 304 F.3d at 220. In that regard, there is no question that the issue of whether the agreement permitted class arbitration was squarely presented to the arbitrator. In its brief submitted to the arbitrator on the issue, Sterling expressly asked the arbitrator to "find . . . [t]hat RESOLVE does not allow for class arbitration." Similarly, in the converse, the plaintiffs asked

18

the arbitrator to "find that the RESOLVE Arbitration Agreements at issue permit class arbitration." In sum, the parties agree that they disagree about whether the arbitration agreement permits class arbitration. Put another way, unlike *Stolt-Nielsen*, the parties have not stipulated that the agreement is "silent" as to class arbitration—that is, the parties here are not in agreement that the RESOLVE agreement contains no explicit or implicit intent regarding the issue of class arbitration—and there is no escaping the fact that the parties submitted that question to the arbitrator for a decision.

Nor did the arbitrator exceed her authority under the agreement or the law by deciding the issue and ruling that the arbitration agreement allowed the plaintiffs to pursue class arbitration even though the agreement lacked an express provision permitting class arbitration. *Stolt-Nielsen*, on which the district court relied, did not create a bright-line rule requiring that arbitration agreements can only be construed to permit class arbitration where they contain express provisions permitting class arbitration. 130 S. Ct. at 1776 n.10. There is nothing in the agreement itself, moreover, that prohibits an arbitrator from determining whether the agreement contemplates class arbitration. In other words, the arbitrator was acting within her authority when she concluded that the arbitration agreement between Sterling and the plaintiffs manifested an intent to allow for class arbitration because the issue was properly before her having been placed there by the parties. In addition, she had a colorable justification under Ohio law to reach the decision she did, to wit, Ohio law does not bar class arbitration.

By re-examining the record to determine the question that the arbitrator had already decided—whether the parties intended to permit arbitration of class claims—the district court substituted its legal reasoning for the arbitrator's. Yet the only question before it, both preceding

19

and following the issuance of *Stolt-Nielsen*, was whether the arbitrator was authorized by the parties, the agreement, and applicable law to render the decision she did. The record demonstrates unequivocally that the arbitrator operated within the bounds of her authority in reaching her decision. Sterling has not argued, nor would we find, that the decision manifestly disregarded the law. The decision of the arbitrator should thus be confirmed.

It is worth reemphasizing that the primary thrust of our decision is whether the district court applied the appropriate level of deference when reviewing the arbitration award. With all due respect, our dissenting colleague appears to have fallen into the same trap as did the district court by focusing, to the point of disposition, on what the "correct" interpretation of *Stolt-Nielsen* should be. Like the district court, the dissent fails to identify how the arbitrator exceeded her authority, which, if true, would be a valid basis for vacating the award. Indeed, the dissent explicitly acknowledges that the arbitrator faithfully followed the law as it existed at the time of her decision. (Dissenting Op. p. 6). Our Circuit has never held that an intervening change of law, standing alone, provides grounds for vacating an otherwise proper arbitral award.

Instead, the dissent, like the district court, focuses impermissibly on substituting its interpretation of what the arbitration agreement does or does not allow—a function explicitly submitted by the parties to the sound judgment of the arbitrator. To achieve the result that both the dissent and the district court would impose in this case would require that we forsake the "substantial deference" we have for decades accorded to an arbitrator's decision that is rendered within the authority given her by the parties and under law. *Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997). There is simply no basis for abandoning that principle in this case and toppling the pedestal on which our federal jurisprudence has repeatedly

20

placed a properly authorized arbitrator's determination of the facts and analysis of the law. To do so here in order to strike down the arbitral determination allowing class arbitration requires throwing the baby out with the bathwater.

C. Sterling's interpretation of *Stolt-Nielsen* is not persuasive

In support of the district court's determination, Sterling argues that the agreement is "silent" on the issue of class arbitration because it does not contain an express provision permitting class arbitration and that the arbitrator found that the arbitration agreement did not *prohibit* class arbitration, rather than finding that it *permitted* class arbitration. Sterling's arguments are unpersuasive.

To begin with, in fairness to the arbitrator, the legal standard she was operating under at the time framed the issue as whether the applicable law *prohibited* class arbitrations. J.A. 703 (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 548 F.3d 85, 100-01 (2d Cir. 2008) *overruled by Stolt-Nielsen*, 130 S. Ct. 1758 (2010) (reversing vacatur award where party had not cited any "federal maritime law or New York State law establishing a rule of construction prohibiting class arbitration where the arbitration clause is silent on that issue")). Nonetheless, it was Sterling that framed the issue and asked the arbitrator to find that the agreement did not allow for—i.e., prohibited—class arbitration, and it was the plaintiffs who asked the arbitrator to find that the agreement permitted class arbitration. A determination that class arbitration is not prohibited under the agreement clearly answers both parties' question. The arbitrator's analysis, using principles of contract interpretation under Ohio law, included an examination of the language of the contract to determine the parties' implicit intent to permit class arbitration. That

21

she phrased her conclusion in the negative is of no moment and certainly does not indicate she improperly reached an issue that was not before her.

Sterling's attempt to equate the lack of an express agreement with a lack of intent to agree to class arbitration also misses the mark because it relies on a rationale that *Stolt-Nielsen* did not advance. *Stolt-Nielsen* did not hold that the intent to agree to arbitration must be stated expressly in an arbitration agreement. 130 S. Ct. at 1776 n.10 ("We have no occasion to decide what contractual basis may support a finding that the parties agreed to authorize class-action arbitration. Here, as noted, the parties stipulated that there was 'no agreement' on the issue of class-action arbitration."). Moreover, the negative inferences from the *Stolt-Nielsen* opinion supports the approach taken by the arbitrator. A primary basis for the Supreme Court's decision to vacate the arbitration award in *Stolt-Nielsen* was that the arbitration award went beyond the terms of the agreement and governing law, and the panel relied on public policy grounds to support its finding that the arbitration agreement permitted class arbitration. 130 S. Ct. at 1767-68. None of those factors obtains here.

The dissent states that the FAA, not state law, establishes the primary principle that the parties must consent to arbitration. Dissenting Op. at 6-7. We do not disagree. We disagree, however, that state law is "irrelevant" for the issues presented here. We note that in *Stolt-Nielsen*, a primary concern for the Court was that the arbitration panel based its holding on public policy grounds, rather than looking to the FAA, maritime, or state law. 130 S. Ct. at 1768-69. Indeed, although the FAA absolutely requires that the parties "not be compelled . . . to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so," where that agreement contains what is argued to be an implicit agreement to submit to

22

class arbitration, the arbitrator must necessarily look to state law principles of contract interpretation in order to divine whether such intent exists. *Id.* at 1773, 75 ("While the interpretation of an arbitration agreement is generally a matter of state law, the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion.") (internal quotation marks and citations omitted).

In divining the parties' intent on the issue of class arbitration, the arbitrator relied solely on the terms of the agreement and Ohio law: "[u]nder Ohio law, contracts are to be interpreted so as to carry out the intent of the parties, as that intent is evidenced by the contractual language." J.A. 703 (citing *Skivolocki v. East Ohio Gas Co.*, 38 Ohio St. 2d 244, 247 (1974)). Based on the language of the agreement, to deny the plaintiffs the right to seek classwide relief would deny them access to at least one type of legal or equitable relief available to them in court—namely, certification to pursue classwide relief. That result would be contrary to the promise of the RESOLVE arbitration agreement, which states that by signing the agreement the employee is waiving any right to seek relief through any government agency or court, but that she "may, however, seek and be awarded equal remedy through the RESOLVE program" and that the arbitrator has the "power to award any types of legal or equitable relief that would be available in a court of competent jurisdiction."

Sterling also argues unpersuasively that this language is similar to the language of the arbitration clause in *Stolt-Nielsen*. The arbitration clause in *Stolt-Nielsen*, however, was not as broadly worded as the RESOLVE agreement. It merely stated that the arbitration clause would be applicable to "[a]ny dispute arising from the making, performance or termination of this Charter Party." *Stolt-Nielsen*, 130 S. Ct at 1765. That is not the same as saying that the

23

employee "may, however, seek and be awarded equal remedy through the RESOLVE program" and that the arbitrator has the "power to award any types of legal or equitable relief that would be available in a court of competent jurisdiction."

*Stolt-Nielsen* has reaffirmed the basic precept of the FAA, that "arbitration is a matter of consent, not coercion." *Id.* at 1773 (quoting *Volt*, 489 U.S. at 479). "Whether enforcing an agreement to arbitrate or construing an arbitration clause, courts and arbitrators must 'give effect to the contractual rights and expectations of the parties.'" *Id.* at 1773-74 (quoting *Volt*, 489 U.S. at 479). The intent of the parties, therefore, is controlling. *Id.* at 1774. "Underscoring the consensual nature of private dispute resolution, we have held that parties are generally free to structure their arbitration agreements as they see fit." *Id.* (internal quotation marks omitted). It is clear from the terms of the arbitration agreement that Sterling required its employees to sign that the parties intended to make available in arbitration all remedies and rights that would otherwise be available in court or before a government agency. It was not unreasonable, and clearly not manifestly wrong, for the arbitrator to construe this to mean that the parties also intended to include the right to proceed as a class and seek class remedies. To read that right out of the arbitration agreement would fail to give effect to the employees' contractual rights and expectations of what the arbitration agreement provides.[2]

---

[2] As an aside, it is a bit disingenuous for Sterling to argue that permitting class arbitration to proceed would lose sight of the requirement that "parties may specify with whom they choose to arbitrate their disputes," *Stolt-Nielsen*, 130 S. Ct. at 1774, because the putative class in this case would presumably include only employees who signed the RESOLVE agreement. Accordingly, because Sterling and each potential member of the putative class agreed to arbitrate their disputes, they implicitly agreed that they may seek to do so as a class, and Sterling is certainly not being forced to arbitrate with anyone whom it did not require to arbitrate with it.

24

Regardless, whether the arbitrator was right or wrong in her analysis, she had the authority to make the decision, and the parties to the arbitration are bound by it.[3] In sum, we hold that the arbitrator did not exceed her authority in determining that the agreement permitted the plaintiffs to proceed with their effort to certify a class in the arbitration proceedings.

## IV. Conclusion

For the reasons stated, we REVERSE the judgment of the district court vacating the arbitration award and REMAND with instructions to confirm the arbitration award.

---

[3] We further note that the arbitrator's decision merely permits the plaintiffs to seek class certification; it does not make it a foregone conclusion that a class will be certified. The arbitrator must still consider the propriety of class certification in this case if and when an application to certify a class is advanced. That consideration will no doubt include examination of the problems identified in the dissent regarding the feasibility of class certification in the circumstances presented here. The articulation of the principles set forth in *Wal-Mart Stores, Inc. v. Dukes*, ___ U.S. ___, 2011 WL 2437013 (June 20, 2011), may well be principles for the arbitrator to consider when she is presented with the employees' motion actually to certify a class. However, in no way do they inform or detract from the question presented by the parties to the arbitrator for decision—to wit, whether the agreement permits class arbitration at all.

WINTER, Circuit Judge dissenting:

I respectfully dissent.

This case is the arbitration counterpart to <u>Wal-Mart Stores, Inc. v. Dukes</u>, 546 U.S. ___, 2011 WL 2437013 (June 20, 2011). As in <u>Wal-Mart</u>, the class action complaint filed by appellants in the Southern District, followed by their request for class arbitration, the subject of this proceeding, asserted a company-wide gender discrimination claim against a national employer based on a statistical study finding disparities in pay and promotions between male and female employees where the company has delegated relevant decision-making power to local executives. <u>Wal-Mart</u>, 2011 WL 2437013, at *9-10. I need not pause to consider the <u>Wal-Mart</u> decision's effect on the present matter because <u>Stolt-Nielsen v. AnimalFeeds International Corp.</u>, 130 S. Ct. 1758 (2010), is a binding precedent on all fours.

The issue in <u>Stolt-Nielsen</u>, which reversed a decision of this court, was, in the Supreme Court's words, "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the Federal Arbitration Act (FAA)." <u>Id.</u> at 1764. The Court answered that question in the negative. <u>Id.</u> at 1775.

My colleagues attempt to distinguish <u>Stolt-Nielsen</u> on several grounds. First, they note the stipulation in <u>Stolt-Nielsen</u> that the arbitration agreement there was "silent" as to class arbitration. Maj. Op. at 11-12, 18. Second, they rely on <u>Stolt-Nielsen</u>'s recognition of the possibility of implied agreements to class arbitration. Maj. Op. at 13-14, 18. Third, they make reference to the arbitrator's reliance on Ohio law in this case. Maj. Op. at 19, 21-23. Fourth, they rely on provisions of the various arbitration agreements at issue here empowering

1

arbitrators to award generally available types of legal and equitable relief. Maj. Op. at 23-24.

Fifth, and finally, they invoke the limited scope of judicial review of arbitration agreements.

Maj. Op. at 19-21. None of these grounds, which I address seriatim, suffices to distinguish Stolt-

Nielsen.

## I.

My colleagues emphasize the existence of a stipulation between the parties in Stolt-

Nielsen that the pertinent arbitration clause was "silent" as to class arbitration. Maj. Op. at 11-

12, 18. This stipulation simply reflected the fact that each party recognized that the arbitration

clause neither specifically authorized nor specifically prohibited class arbitration. Brief for

Respondent at 26, Stolt-Nielsen, 130 S. Ct. 1758 (2010) (No. 08-1198), 2009 WL 3404244 at

*26. The disputed issue was, as it was in the Second Circuit, the effect of that silence.

Stolt-Nielsen SA v. AnimalFeeds Int'l Corp., 548 F.3d 85, 86 (2d Cir. 2008) ("The question

presented on this appeal is whether the arbitration panel, in issuing a clause construction award

construing that silence to permit class arbitration, acted in manifest disregard of the law."). That

is precisely the issue in this matter.

Neither party here claims that any of the various arbitration clauses at issue[1] either

specifically authorizes or specifically precludes class arbitration, the same facts that constituted

the "silence" that existed in Stolt-Nielsen. Indeed, that is the reason my colleagues seek refuge

in a non-existent finding of the arbitrator, discussed infra Part II, that an agreement to class

arbitration was implied.

---

[1] Many arbitration agreements, with significantly different provisions, were signed by the individual Sterling employees, see infra, p.4.

2

If the parties' arguments here and the face of the agreements are insufficient to establish their "silence," then the arbitrator's decision certainly was when she explicitly found "there is no mention of class claims." Clause Construction Award (Ex. F to Sterling Mem. of Law in Support of Mot. to Vacate) at 3, Jock v. Sterling Jewelers, Inc., 677 F. Supp. 2d 661 (2009) (No. 08 Civ. 2875). That being the case, and not having the benefit of the Supreme Court's views in Stolt-Nielsen, the arbitrator framed the issue before her by specifically relying on the Second Circuit's decision in Stolt-Nielsen. Following our now-reversed decision, she found only that the arbitration clauses here did not "prohibit class arbitrations," and therefore that they allowed class arbitrations. Clause Construction Award, supra, at 4. In short, the arbitrator viewed the arbitration clause here as, in all pertinent respects, identical to that in Stolt-Nielsen.[2]

## II.

My colleagues also seek to distinguish Stolt-Nielsen on the ground that the decision recognized the possibility of implied agreements to class arbitration. Maj. Op. at 13-14, 18. True. However, the Supreme Court explicitly held that, in an FAA proceeding, an implied agreement could not be inferred from an arbitration clause's failure to "preclude class

---

[2] Moreover, my colleagues' narrow reading of Stolt-Nielsen -- limiting it to cases with supposed formal stipulations as to contractual silence -- casts grave doubt over the reasons for the Court's even granting a writ of certiorari in that case. Under Supreme Court Rule 10, "a writ of certiorari will be granted only for compelling reasons." The Supreme Court grants such writs only where "a state court or a United States court of appeals has decided an important question of federal law that has not been, but should be, settled by this Court, or has decided an important federal question in a way that conflicts with relevant decisions of this Court." Sup. Ct. R. 10(c). If Stolt-Nielsen resolves only the effect of a sui generis and idiosyncratic stipulation of the parties, the case hardly meets those criteria. Given my colleagues' narrow reading of the decision and their reliance on an analysis indistinguishable from the decision of the Second Circuit reversed by the Supreme Court, Stolt-Nielsen has been rendered an insignificant precedent in this circuit.

3

arbitrations." 130 S. Ct. at 1775 (emphasis omitted). Had it not decided that question, the Court would have had either to address whether such an agreement might be implied from the arbitration clause in that case or to remand for such a determination. Instead, it held that "imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is [in]consistent with the Federal Arbitration Act." Id. at 1764, 1775-76.

An "implicit" agreement to class arbitration cannot, therefore, be inferred from an arbitration agreement's "silence" or "failure to preclude" class arbitrations, much less from thin air. Indeed, the arbitrator in this case did not purport to find an implied agreement. Following our decision in Stolt-Nielsen, where we speculated that "the arbitration panel may have concluded that even though the arbitration clauses are silent . . . their silence bespeaks an intent not to preclude class arbitration," 548 F.3d at 99, she inferred the class arbitration agreement entirely from the failure of the various agreements to "prohibit class arbitration," precisely what the Supreme Court said cannot be legitimately done. 130 S. Ct. at 1775.

Nowhere in her opinion does she purport to identify any provision of the agreement supporting the existence of an implied agreement. Far from it. Some of the agreement's provisions are in fact inconsistent with class arbitration, and the arbitrator had to manifestly disregard key provisions of the arbitration clauses in order to hold that class arbitration was authorized.

The members of the purported class each signed a provision that was often different from that signed by other members of the purported class. The arbitration clauses contain significant differences as to: (i) waiver of rights to seek relief in other tribunals; (ii) the kinds of disputes subject to the RESOLVE program; (iii) the particular laws under which claims may arise; (iv)

4

contribution amounts by employees to the costs of arbitration; (v) descriptions of the relief available; (vi) limitations periods; (vii) the role of a court before which litigation has already begun; (viii) where the arbitration is to take place; and (ix) the source of the law under which the arbitrable claim is to be decided. See Spagnola Affidavit (Ex. C to Sterling's Mem. of Law in Support of Mot. to Vacate) at Tab 2, Jock, 677 F. Supp. 2d 661 (No. 08 Civ. 2875).

When the various agreements are read in the aggregate, or even separately, the differences preclude class arbitrations. The arbitrator herself acknowledged that many of the arbitration agreements contained "unique contractual provisions for local venues, the application of local laws, and the selection of locally-licensed arbitrators," Clause Construction Award, supra, at 4, all of which are inconsistent with class arbitration. Pertinent common themes in the arbitration clauses are (i) the need to follow Steps 1 and 2 of the RESOLVE program -- Step (1): a complaint with reference to supporting evidence; and Step (2): resort to mediation if Sterling does not remedy the complaint -- and (ii) the failure to mention class arbitration -- silence. These common provisions are inconsistent with an implied agreement to class arbitration. As a result, the arbitrator found it necessary to hold that Steps 1 and 2 of the RESOLVE program were to be ignored in class arbitrations. Then, having framed the issue according to this court's Stolt-Nielsen decision, she went on to find that the failure to "prohibit class arbitrations" prevailed. Clause Construction Award, supra, at 5.

My colleagues dismiss as "disingenuous" Sterling's argument "that permitting class arbitration to proceed would lose sight of the requirement that 'parties may specify with whom they choose to arbitrate their disputes,' Stolt-Nielsen, 130 S. Ct. at 1774, because the putative class in this case would presumably include only employees who signed the RESOLVE

5

agreement." Maj. Op. at 24 n.3. However, Sterling agreed to arbitrate only with employees who complete steps 1 and 2 of the RESOLVE procedures; it has not agreed to arbitrate with each and every employee that signed the RESOLVE program agreement, whether or not they assert a claim pursuant to its provisions.

Far from implying class arbitration from the agreement, therefore, the arbitrator manifestly disregarded both unique and common features of all the agreements based on the view of silence as to class arbitration upheld by the Second Circuit in Stolt-Nielsen but thereafter rejected by the Supreme Court. Having now been enlightened by the Supreme Court's views, we do not have the arbitrator's excuse.

III.

My colleagues also believe that the arbitrator purported to be acting under Ohio law. Maj. Op. at 19, 21-23. That is not the case. All she stated about Ohio law was that "the question of whether class claims are permitted or prohibited by an agreement that does not expressly address the issue . . . has apparently not been addressed in any reported decision by an Ohio court." Clause Construction Award, supra, at 4.

Moreover, Ohio law does not govern the issue before us. Stolt-Nielsen held that consent to class arbitration cannot be inferred from an agreement's failure to preclude it. The Supreme Court did not base its decision on the law of a particular state or federal maritime law. Rather, it relied on principles of law derived solely from the Federal Arbitration Act. Stolt-Nielsen,130 S. Ct. at 1773 ("While the interpretation of an arbitration agreement is generally a matter of state law, the FAA imposes certain rules of fundamental importance, including the basic precept that arbitration 'is a matter of consent, not coercion.'") (internal citations omitted); id. at 1775 ("The

6

[arbitration] panel's conclusion is fundamentally at war with the <u>foundational FAA principle</u> that arbitration is a matter of consent.") (emphasis added).  The Court's exclusive reliance on the FAA as a source of governing law was in contrast to the Second Circuit's extensive discussion of New York and federal maritime law in its <u>Stolt-Nielsen</u> decision, 548 F.3d at 96-101, and to the arguments before the Supreme Court that there were considerable precedents in New York and maritime law authorizing class arbitration in the face of contractual silence.  Brief for Respondent at 31-33 & 38, <u>Stolt-Nielsen</u>, 130 S. Ct. 1758 (No. 08-1198).

The Supreme Court treated New York and federal maritime law as irrelevant.  Rather, it framed the question as "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the Federal Arbitration Act," and answered that question in the negative.  <u>Stolt-Nielsen</u>, 130 S. Ct. at 1764.  The exclusive role of the FAA in providing substantive law to determine the requisite consent to class arbitration was recently confirmed by the Supreme Court's decision in <u>AT&T Mobility LLC v. Concepcion</u>, 131 S. Ct. 1740 (2011).  That case held that the FAA substantive law "preempted" state contract law rendering unenforceable as unconscionable an explicit contractual preclusion of class arbitration. <u>Id.</u> at 1753.

The Supreme Court's concerns under the FAA with inferring consent to class arbitration are based on the fundamental differences between bilateral arbitration and class arbitration.  As <u>Stolt-Nielsen</u> stated:

> An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate.  This is so because class-action arbitration changes the nature of arbitration to such a degree that it cannot be presumed the parties consented to it by simply agreeing to submit their disputes to an arbitrator. . . . Consider just

7

> some of the fundamental changes brought about by the shift from bilateral arbitration to class-action arbitration. An arbitrator chosen according to an agreed-upon procedure no longer resolves a single dispute between the parties to a single agreement, but instead resolves many disputes between hundreds or perhaps even thousands of parties. . . . And the commercial stakes of class-action arbitration are comparable to those of class-action litigation, even though the scope of judicial review is much more limited. We think that the differences between bilateral and class-action arbitration are too great for arbitrators to presume, <u>consistent with their limited powers under the FAA</u>, that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings.

130 S. Ct. at 1775-76 (internal citations omitted) (emphasis added).

Moreover, as the Supreme Court has recently noted at some length, even where a designated arbitration organization has established rules for class arbitration, as has the American Arbitration Association ("AAA") in the present case, the shortcomings of class arbitration are substantial. <u>Concepcion</u>, 131 S. Ct. at 1750-52 ("[W]hile it it theoretically possible to select an arbitrator with some expertise relevant to class-certification question, arbitrators are not generally knowledgeable in the often-dominant procedural aspects of certification, such as the protection of absent parties . . . . The absence of multilayered review makes it more likely that errors will go uncorrected."). Class proceedings carry significant risks for plaintiffs as well as defendants. A class proceeding may well be driven by a quest for a substantial award of counsel fees alone, but the award will bind the members of the class who may pay little attention to the proceedings and are generally unaware of the consequences. Even where, as under the AAA rules, any settlement must be approved by the arbitrator, the critical safeguard of fairness review by an independent Article III judge, present in judicial class actions, is lacking. <u>See</u> <u>id.</u> at 1752; Fed. R. Civ. P. 23. While approval of a settlement by the arbitrator

8

may sometimes be required, counsel will have an influence on both the selection of an arbitrator and even his or her fees. See Hans Smit, Contractual Modification of the Arbitral Process, 113 Penn. St. L. Rev. 995, 1009 (2009) (noting that because the tribunal is normally composed of arbitrators designated by the parties, it will normally agree with the parties once they have agreed upon a proper class and settlement). An arbitrator who disapproves a settlement may do so only at a risk of not being selected in future cases.

## IV.

My colleagues also rely upon the provision in the present agreement that the arbitrators may award any legal or equitable relief generally available in courts. Maj. Op. at 23-24. Clearly, this provision refers only to relief in the form of an award based on a violation of law or contract -- damages, injunctions, etc. -- and not to the availability of procedures used to pursue such relief. A class can be certified and yet not get "relief," i.e. it may lose. Significantly, one form of this provision found in some of the arbitration agreements here states that "the Arbitrator shall have the power to award any types of legal or equitable relief that would be available in a court of competent jurisdiction including, but not limited to, the costs of arbitration, attorney fees and punitive damages for causes of action when such damages are available under law." Spagnola Affidavit at Tab 2, supra, at 1. Applying the canon "ejusdem generis" -- a general item in a list of specific items of a particular genre must be construed to be limited to that genre, see Rajah v. Mukasey, 544 F.3d 427, 435 (2d Cir. 2008) -- the word "relief" is a reference to remedies compensating or punishing for harm done.

## V.

Finally, my colleagues note the limited review of arbitration awards exercised by federal courts.  Maj. Op. at 19-21.  While that is surely a relevant point, this concern was not only as fully applicable to the award in <u>Stolt-Nielsen</u> as it is here but was also discussed extensively by the Supreme Court in that case.  130 S. Ct. at 1767-68.  I will rely on the Supreme Court's discussion.

Moreover, my colleagues' deference here is not to the arbitrator's actual decision, which framed the issue under the Second Circuit's decision in <u>Stolt-Nielsen</u>, found that the agreement made "no mention of class" arbitration, allowed class arbitration because the agreement did not "prohibit" it, and exceeded her authority by manifestly disregarding explicit provisions of the agreement inconsistent with class arbitration.  <u>See</u> <u>Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.</u>, 126 F.3d 15, 23 (2d Cir. 1997) ("[Arbitral] awards may be vacated . . . where the arbitrator's award is in manifest disregard of the terms of the agreement.").  Rather their deference is to a decision that was, in fact, never made by the arbitrator -- namely that the arbitration agreement implied an agreement to class arbitration.

I therefore respectfully dissent.