RAME, LLC d/b/a Cafe Centro, and Patina Restaurant Group, LLC, Petitioners,

v.

Mishi POPOVICH, Sandra Aguilera, Brendan Casey, Johan Mestanza, David Hewetson, Samuel Cuevas, and Bonnie Wickard, on behalf of themselves and all Others similarly situated, Respondents.

No. 12 Civ. 1684.

United States District Court, S.D. New York.

July 9, 2012.

Sheppard Mullin, Richter & Hampton, LLP, by: Jonathan Stoler, Esq., Eric

David Raphan, Esq., New York, NY, for Petitioners.

Berke–Weiss & Pechman LLP, by: Jessica N. Tischler, Esq., Louis Pechman, Esq., Nahir Marely Mercado, Esq., New York, NY, for Respondents.

## OPINION

SWEET, District Judge.

Petitioners Rame, LLC d/b/a Cafe Centro and Patina Restaurant Group (collectively, the "Petitioners") have filed a petition to (1) vacate arbitrator Bonnie Weinstock's (the "Arbitrator") Partial Final Award on Clause Construction, dated February 6, 2012 (the "Award"), pursuant to 9 U.S.C. § 10, and (2) remand the matter to the Arbitrator, directing her to proceed with each respondents' claims in separate arbitrations on an individual basis. In her Award, the Arbitrator ruled that the arbitration agreement (the "Agreement") between the Petitioners and the respondents Mishi Popovich ("Popovich"), Sandra Aguilera ("Aguilera"), Brendan Casey ("Casey"), Johan Mestanza ("Mestanza"), David Hewetson ("Hewetson"), Samuel Cuevas ("Cuevas") and Bonnie Wickeraad ("Wickeraad") (collectively, the "Respondents") permits collective proceedings in arbitration. Upon the facts and conclusions set forth below, the petition to vacate is denied.

## I. Prior Proceedings

Respondents filed a complaint against Petitioners in *Popovich, et al. v. Rame, LLC d/b/a Cafe Centro, et ano,* 11 Civ. 680(LBS) on January 31, 2011, which asserted class and collective action claims for unpaid wages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.,* and under the New York Labor Law ("NYLL"), § 190 *et seq.* On May 20, 2011, the Petitioners filed a motion to dismiss and compel arbitration, alleging that, under the Agreement, the Respondents were required to arbitrate their claims. In response to the motion to compel arbitration, on July 1, 2011, the Respondents voluntarily dismissed, without prejudice, the complaint and commenced arbitration.

Pursuant to the parties' joint stipulation, dated September 23, 2011, the parties agreed to and selected the Arbitrator. They also agreed to engage in motion practice to obtain a threshold clause construction award from the Arbitrator on whether the Respondents' claims could be brought in arbitration on a class or collective action basis.[1] After several rounds of briefing, on February 6, 2012, the Arbitrator issued the Award, permitting the Respondents to pursue their claims on a class-wide or collective action basis. The Arbitrator stayed its decision to permit the parties to seek judicial review and the Petitioners filed an application to vacate the Award.

The instant motion was heard and marked fully submitted on April 11, 2012.

## II. The Facts

The facts are set forth in the Award, the complaint and the declarations submitted

---

1. More specifically, the Agreement states, in pertinent part:

"Construction of the Arbitration Clause Upon appointment, the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class (the "Clause Construction Award"). The arbitrator shall stay all proceedings following the issuance of the Clause Construction Award for a period of at least 30 days to permit any party to move a court of competent jurisdiction to confirm or to vacate the Clause Construction Award."

by the parties and are not in dispute except as noted below.

Café Centro is a restaurant located at 200 Park Avenue, New York, New York. Patina is a corporate parent of Cafe Centro. The Respondents are individuals who were former employees at Cafe Centro, who worked as a waiter, waitress, bartender, food runner and busser at various times from 1995 to June 2010 in periods ranging from nine months to more than seven years.

Beginning in November 2007, Cafe Centro's management distributed a new Hourly Team Member Handbook (the "Handbook") and a copy of a Dispute Resolution Agreement (the "DRA") to the restaurant's hourly employees for their review and execution.

In connection with the distribution of the Handbook, in November 2007, Cafe Centro's management conducted a series of mandatory staff meetings with its hourly employees. Each employee was required to attend at least one of these meetings.

The Handbook contains a Dispute Resolution Policy (the "DR Policy"), which provides that all claims relating to an individual hourly employee's employment must be submitted to final and binding arbitration. More specifically, the DR Policy provides, in pertinent part:

By accepting or continuing your employment with the Company, you will be agreeing that both you and the Company will resolve by mediation and final and binding arbitration any claim that would otherwise be resolved in a court of law. The claims governed by this agreement are those that you or the Company may have relating to your employment with, behavior during, or termination from the Company. Claims for workers' compensation or unemployment compensation benefits are not sub-

ject to this agreement ... The arbitrator will decide all claims according to law, may award all damages and relief allowed by law, and will make an award with a written opinion with findings of facts and conclusions of law.

Similar to the DR Policy, the DRA requires that all claims relating to an individual's employment be submitted to final and binding arbitration. Specifically, the DRA provides in pertinent part that;

... The claims governed by this agreement are those that you or the Company may have relating to your employment with, behavior during or termination from, the Company. Claims for workers' compensation or unemployment compensation benefits are not subject to this agreement.

By accepting or continuing employment with the Company, you and the Company both agree to resolve such claims through final and binding arbitration. This includes, but is not limited to, claims of employment discrimination because of race, sex, religion, national origin, color, age, disability, medical condition, marital status, gender identity, sexual preference or any sexual harassment and unlawful retaliation; any claims under contract or tort law; any claim for wages, compensation or benefits; and any claim for trade secret violations, unlawful competition or breach of fiduciary duty.

... You and the Company agree that the dispute will be resolved by final and binding arbitration ... The arbitrator may award any remedy or relief as a court could award on the same claim.

Notably, the DR Policy and the DRA are devoid of any reference to arbitration on a class-wide or collective basis.

The Respondents have admitted that they received the Handbook containing the

DR Policy, which they read and understood. In addition, Aguilera, Hewetson, Cuevas and Wickeraad each commenced their employment at Cafe Centre after November 2007 and, thus, signed a DRA when they began their employment at Cafe Centro. They also signed an Employment Acknowledgement and Agreement (the "Acknowledgment") that provides, in pertinent part:

I acknowledge that I have received a copy of the Company's Handbook and understand that it contains important information on the Company's general policies. I acknowledge that I am expected to read, understand, and adhere to company policies and will familiarize myself with the material in the Handbook, Team Member understands and acknowledges that this Agreement is subject to the terms and conditions of the Dispute Resolution provisions contained in the Team Member Handbook and Dispute Resolution Agreement

Your signature below acknowledges that you have been given sufficient time to read and understand this document and that you agree to comply with the standards herein.

Both Hewetson and Popovich admit that, upon receipt of the DR Policy and DRA, they had a general understanding as to the purpose of these documents and asked certain questions regarding the policies. None of the Respondents, however, allege that they asked whether the DRA and DR Policy permitted class or collective proceedings.

### III. The Standard For Vacatur Under the FAA

In enacting the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA"), Congress intended to place arbitration agreements on equal footing with other contracts and establish a strong federal policy in favor of arbitration. *See AT & T Mobil-*

*ity LLC v. Concepcion,* —— U.S. ——, 131 S.Ct. 1740, 1745, 179 L.Ed.2d 742 (2011); *Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 96 L.Ed.2d 426 (1987). Thus, the FAA requires courts to "rigorously enforce agreements to arbitrate." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) (citation omitted).

Under Section 9 of the FAA, "a court 'must' confirm an arbitration award 'unless' it is vacated, modified, or corrected 'as prescribed' in §§ 10 and 11." *Id.* (quoting 9 U.S.C. § 9). The FAA supplies a "streamlined" mechanism for a party seeking "a judicial decree confirming an award, an order vacating it, or an order modifying or correcting it." *Hall St. Assocs., LLC v. Mattel, Inc.,* 552 U.S. 576, 582, 128 S.Ct. 1396, 170 L.Ed.2d 254 (2008).

Section 10(a)(4) of the FAA, which the Petitioners invoke in seeking to vacate the Award, provides grounds for vacatur where, among other reasons, "the arbitrators exceed their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter was not made." 9 U.S.C. § 10(a)(4).

The Second Circuit has "consistently accorded the narrowest of readings to [§ 10(a)(4) ], in order to facilitate the purpose underlying arbitration: to provide parties with efficient dispute resolution, thereby obviating the need for protracted litigation." *ReliaStar Life Ins. Co. of N.Y. v. EMC Nat. Life Co.,* 564 F.3d 81, 85 (2d Cir.2009). This is "especially" true when Section 10(a)(4) is invoked to challenge an award deciding "a question which all concede to have been properly submitted in the first instance." *DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 824 (2d

Cir.1997) (quoting *Fahnestock & Co. v. Waltman,* 935 F.2d 512, 515 (2d Cir.1991)).

■ In addition, "[i]f the parties agreed to submit an issue for arbitration, we will uphold a challenged award as long as the arbitrator offers a barely colorable justification for the outcome reached." *ReliaStar,* 564 F.3d at 86 (internal quotation marks omitted). "In other words, 'as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of this authority,' a court's conviction that the arbitrator has 'committed serious error' in resolving the disputed issue 'does not suffice to overturn his decision.'" *Id.* (quoting *United Paperworkers Int'l Union AFL–CIO v. Misco, Inc.,* 484 U.S. 29, 39, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).

■ Put simply, a party contending that the decision of the arbitration panel must be vacated bears a heavy burden and "must clear a high hurdle ... in order to obtain that relief." *Stolt–Nielsen S.A. v. AnimalFeeds Int'l Corp.,* 559 U.S. 662, 130 S.Ct. 1758, 1767, 176 L.Ed.2d 605 (2010). "It is not enough for petitioners to show that the panel committed an error-or even a serious error. It is only when [an] arbitrator strays from interpretation and application of the agreement and effectively 'dispense[s] his own brand of industrial justice' that his decision may be unenforceable." *Id.* (citations omitted).

■ Thus, in considering a Section 10(a)(4) challenge, "[t]he principal question for the reviewing court is whether the arbitrator's award draws its essence" from the agreement to arbitrate. *ReliaStar,* 564 F.3d at 86 (quoting *187 Concourse Assocs. v. Fishman,* 399 F.3d 524, 527 (2d Cir.2005)). "If the answer to this question is yes, ... the scope of the court's review of the award itself is limited." *Id.* at 85–86. The court does not consider "whether the arbitrators correctly decided [the] issue." *Banco de Seguros del Estado v. Mut. Marine Office, Inc.,* 344 F.3d, 255, 262 (2d Cir.2003).

■ Courts in this circuit have also vacated arbitration awards that are in "manifest disregard of the law." *See Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998). While the future of the "manifest disregard" standard is unsettled, *see Stolt–Nielsen,* 130 S.Ct. at 1768 n. 3 (stating that the Supreme Court would "not decide whether 'manifest disregard' survives") in this circuit, "manifest disregard" has been reconceptualized as "a judicial gloss" on the FAA's specific grounds for vacatur, and so interpreted, "remains a valid ground for vacating arbitration awards." *T. Co Metals, LLC v. Dempsey Pipe & Supply, Inc.,* 592 F.3d 329, 340 (2d Cir.2010) (citation omitted).

■ "[A]wards are vacated on grounds of manifest disregard only in those exceedingly rare instances where some egregious impropriety on the part of the arbitrator is apparent." *Id.* at 339 (citation omitted). Such impropriety requires "more than error or misunderstanding with respect to the law, or an arguable difference regarding the meaning or applicability of law urged upon an arbitrator." *Id.* (citation omitted). The two part showing requires the court to consider, first, "whether the governing law alleged to have been ignored by the arbitrator was well defined, explicit, and clearly applicable," and, second, "whether the arbitrator knew about the existence of a clearly governing legal principle but decided to ignore it or pay no attention to it." *Westerbeke Corp. v. Daihatsu Motor Co., Ltd.,* 304 F.3d 200, 209 (2d Cir.2002).

## IV. The Threshold Issue

Applying the above principles to this case, the Court considers first, whether

the parties had submitted to the Arbitrator the question of whether the Agreement permitted class arbitration and, second, whether the Agreement or the law categorically prohibited the Arbitrator from resolving the threshold issue so that the Award should be vacated. *See Jock v. Sterling Jewelers Inc.*, 646 F.3d 113, 122 (2d Cir.2011).

Unable to agree upon the definition of the threshold legal issue, the parties proposed their respective versions to the Arbitrator to determine which was most appropriate. (Jt.Stip.¶ 5). The Petitioners submitted the threshold issue, as follows: "May Claimants attempt to pursue a claim or claims in arbitration on behalf of others on a class-wide and/or collective bases where, as here, the DRA does not specifically refer to the terms 'class' or 'collective' arbitration and is otherwise silent on the issue 'class' or 'collective' arbitration." (*Id.*) The Respondents presented the threshold issue, as follows: "May the arbitration proceed on a collective and/ or class action basis?" (*Id.*) The Arbitrator was to issue her decision on the threshold question and issue the Award in accordance with the terms of the Agreement and the American Arbitration Association's ("AAA") Employment Arbitration Rules and any related supplemental rules. (Resp. Opp. at 3–4).

Rule 3 of the Supplemental Rules of the AAA stat pertinent part, that:

> Upon appointment, the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class.

While the parties had minor language differences as to how to frame the issue presented, both parties generally sought a ruling as to whether the Agreement permitted the Respondents to bring their claims on a collective or class basis. Therefore, the Arbitrator was considering an issue which the parties had submitted for her consideration.

## V. The Arbitrator Did Not Exceeded Her Authority

■ A court may properly find that an arbitrator exceeded her authority if the arbitrator has "consider[ed] issues beyond those the parties have submitted for her consideration" or "reach[ed] issues clearly prohibited by law or by the terms of the parties' agreement." *Jock*, 646 F.3d at 122. The Second Circuit has drawn a distinction between these two situations. In the first, "the law or the parties' agreement categorically prohibits the arbitrator from reaching an issue so that, in reaching that issue, the arbitrator exceeds her authority." *Id.* at 123 (citing *Westerbeke*, 304 F.3d at 220). In the other, "the parties grant the arbitrator the authority to determine an issue, but the arbitrator makes an error of law in deciding that issue." *Westerbeke*, 304 F.3d at 220.

■ Here, the Respondents contend that neither situation applies. They argue that the Arbitrator did not exceed her authority, because the issue of whether a collection action could proceed "was squarely presented to the Arbitrator" and that the Agreement itself contained language that "the arbitrator will decide all claims according to law, may award all damages and relief allowed by law," and that "[t]he arbitration may award any remedy or relief as a court could award on the same claim." (Resp. Opp. at 4–5). Thus, the Arbitrator was granted the authority to determine the issue and no error of law was made.

In contrast, the Petitioners argue that the Arbitrator exceeded her authority under the parties' DRA and DR Policy.

(Pet. Memo at 9). More specifically, they argue that "the Award fails to adhere to well-settled Supreme Court precedent and basic New York contract interpretation principles all of which clearly provide that neither the DRA nor the DR Policy give the Arbitrator the authority to preside over class/collective claims." (*Id.*). Accordingly, the Petitioners urge the Court to find that the Arbitrator exceeded her proper authority and to vacate the Award.

*The Decisions in Bazzle, Stolt–Nielsen and Jock*

An examination of recent Supreme Court and Second Circuit decisions, however, compels a contrary result. In *Stolt–Nielsen*, the Court discussed, but left open, the ambiguity created by *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003), in attempting to resolve whether a court or an arbitrator should decide if an arbitration agreement permits class arbitration when the agreement does not contain express class arbitration language. *Stolt–Nielsen*, 130 S.Ct. at 1771. A four Justice plurality in *Bazzle* determined that where the question is whether collective arbitration is permissible, it is a procedural matter and thus for an arbitrator. *Bazzle*, 539 U.S. at 452, 123 S.Ct. 2402. Only in certain limited "gateway matters, such as whether the parties have a valid arbitration agreement at all or whether a concededly binding arbitration clause applies to a certain type of controversy," may a court make the decision. *Id.*

While "*Stolt–Nielsen* pointed out that *Bazzle* did not have the same precedential value as an opinion by a majority of the Court, it did not indicate that the plurality opinion in *Bazzle* was incorrect on the issue of who decides whether a class can arbitrate a dispute." *Guida v. Home Savings of Am., Inc.*, 793 F.Supp.2d 611, 616 (E.D.N.Y.2011). Thus, the *Bazzle* plurali-

ty's holding remains persuasive and instructive. *See Stolt–Nielsen*, 130 S.Ct. at 1772 (stating that "the parties appear to have believed that the judgment in *Bazzle* requires an arbitrator, not a court, to decide whether a contract permits class arbitration ... In fact, however, only the plurality decided that question. But we need not revisit that question here."); *see also Vilches v. The Travelers Cos.*, 413 Fed. Appx. 487, 492 (3rd Cir.2011) (stating that "[w]here contractual silence is implicated, the arbitrator and not a court should decide whether a contract was silent on the issue of class arbitration.") (internal quotations omitted); *Guida*, 793 F.Supp.2d at 617 (concluding that the arbitration panel should decide whether or not the plaintiffs in this case can proceed on a class basis); *Vazquez v. ServiceMaster Global Holding*, No. 09–5148, 2011 WL 2565574, at *3 (N.D.Cal. June 29, 2011) (noting that *Stolt–Nielsen* "clarified that the question remains open" but referred the class arbitration question to the arbitrator); *Smith v. The Cheesecake Factory Restaurants, Inc.*, No. 06–829, 2010 WL 4789947, at *2 (M.D.Tenn. Nov. 16, 2010) (concluding that "whether the parties agreed to class arbitration is to be resolved by the arbitrator[,]" citing *Stolt–Nielsen* and *Bazzle* ).

In *Stolt–Nielsen*, the Supreme Court addressed "whether imposing class arbitration on parties whose arbitration clauses are 'silent' on that issue is consistent with the [FAA]." *Stolt–Nielsen*, 130 S.Ct. at 1765. The parties agreed to submit the class arbitration question to a panel of three arbitrators. *Id.* Significantly, the parties also stipulated that the arbitration clause was "silent" with respect to permitting or prohibiting class arbitration. *Id.* at 1766. Respondent AnimalFeeds counsel explained "that the term 'silent' did not simply mean that the clause made no express reference to class arbitration. Rath-

er, he said '[a]ll the parties agree that when a contract is silent on an issue there's been no agreement that has been reached on that issue.' " *Id.*

In rejecting the arbitration panel's decision to arbitrate class as well as individual claims, the Court expressed concern that the panel "appears to have rested its decision on [a] public policy argument." *Id.* at 1768; *see Concepcion,* 131 S.Ct. at 1750 (noting that in *Stolt–Nielsen,* "we held that an arbitration panel exceeded its power under § 10(a)(4) of the FAA by imposing class procedures based on policy judgments rather than the arbitration agreement itself or some background principle of contract law that would affect its interpretation.").

The Court also considered that "the differences between bilateral and class-action arbitration are too great for arbitrators to presume ... that the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 1776. Thus, the Court held that an agreement to class arbitration cannot be inferred "solely from the fact of the parties' agreement to arbitrate," but that, under the FAA, class arbitration is only appropriate where "there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in original). The parties' agreement, however, could be implicit. *Id.*

In its discussion of *Stolt–Nielsen,* the Second Circuit in *Jock* highlighted the "Court's interpretation of the parties' 'silence' [as] key." *Jock,* 646 F.3d at 120. The *Jock* majority found significant that the parties had stipulated that the agreement was silent, not only in the sense that the contract made no reference to class arbitration, but also that the silence meant the parties had "not reached any agreement on the issue of class arbitration." *Id.* (citing *Stolt–Nielsen,* 130 S.Ct. at 1768).

Thus, the "parties were in complete agreement regarding their intent," that "there was no express or implicit intent to submit to class arbitration." *Id.*

In contrast, the dissent in *Jock* believed that "silence" in *Stolt–Nielsen* "was interpreted as 'simply reflect[ing] the fact [that] each party recognized the arbitration clause neither specifically authorized nor specifically prohibited class arbitration.' " *Id.* The majority disagreed, stating that "[t]he dissent, however, · fails to acknowledge that although that is the interpretation that the Respondents in *Stolt–Nielsen wished* the Court to adopt, that is not the interpretation that the Court *did* adopt." *Id.* (emphasis in original). The *Jock* majority also noted that the Supreme Court "declined to hold that an arbitration agreement must *expressly* state that the parties agree to class arbitration." *Id.* (emphasis in original).

Like the agreement in *Stolt–Nielsen,* the arbitration agreement in *Jock* contained no mention of class arbitration and was "silent" as to that issue. *Id.* at 123. Unlike the parties in *Stolt–Nielsen,* however, the parties in *Jock* did not enter into a stipulation that their agreement was "silent" as to the class arbitration issue and submitted that question to the arbitrator. *Id.* (stating that "[t]he plaintiffs' concession that there was no explicit agreement to permit class arbitration, however, is not the same thing as stipulating that the parties had reached no agreement on the issue."). The Court found that the lack of an express agreement to permit or prohibit class arbitration did not preclude an *implicit* agreement to authorize class-action arbitration. *Id.* (emphasis added).

The Second Circuit noted that the language of the agreement in *Jock* was broader than the agreement in *Stolt–Nielsen.* The arbitration clause in *Stolt–Nielsen* "merely stated that the arbitration clause

would be applicable to Many dispute arising from the making, performance or termination of this Charter Party.'" *Id.* at 126 (quoting *Stolt–Nielsen*, 130 S.Ct. at 1765). In contrast, the clause in *Jock* explicitly granted the arbitrator the "power to award any types of legal or equitable relief that would be available in a court of competent jurisdiction." *Id.* The Court stated that:

> [i]t is clear from the terms of the arbitration agreement that Sterling required its employees to sign that the parties intended to make available in arbitration all remedies and rights that would otherwise be available in court or before a government agency. It was not unreasonable, and clearly not manifestly wrong, for the arbitrator to construe this to mean that the parties also intended to include the right to proceed as a class and seek class remedies.

*Id.* at 127. Thus, there was an implicit agreement to allow for class arbitration. For the Court, the issue, therefore, was not "whether the arbitrator was right or wrong in her analysis," but the appropriate level of deference given to her by the court. *Id.* (stating that the arbitration "had the authority to make the decision, and the parties to the arbitration are bound by it.").

*The Petitioners' Interpretation of the Applicable Precedent is Unpersuasive*

To support their position, the Petitioners contend that post-*Stolt–Nielsen*, "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." 130 S.Ct. at 1775 (emphasis in original). Based upon these principles, which the Petitioners argue are equally applicable here, they state that the Supreme Court rejected an arbitration panel's presumption that "the parties' mere silence on the issue of class-action arbitration constitutes consent to resolve their disputes in class proceedings." *Id.* at 1776.

The Petitioners contend that "[i]t is undisputed that neither the DRA nor the DR Policy make any reference whatsoever to 'class' or 'collective' actions" and that the Respondents have admitted to as much. (Pet. Memo at 11). In the Petitioners' view, the Award "essentially creates a new requirement that is not supported by any case law; namely, that employers must include an affirmative class-action waiver in their arbitration agreements in order for employees to be deemed to have waived their ability to proceed on a class/collective action basis." (Pet. Memo at 9). In addition, Petitioners contend that in light of *Stolt–Nielsen*, the Arbitrator was required to abide by, but failed to even consider, New York law on contract interpretation. (Pet. Reply at 4).

The Petitioners' interpretation, however, fails to consider the treatment of *Stolt–Nielsen* by the Second Circuit in *Jock*. First, the Petitioners adopt an interpretation of "silence," which the *Jock* dissent advocated for, but was explicitly rejected by the majority. Post-*Jock*, "silence" cannot be interpreted to mean that there was no specific authorization or prohibition of class arbitration in the agreement. *See Stolt–Nielsen*, 130 S.Ct. at 1766. Instead, the parties must be in agreement regarding their intent and also stipulate that there was "no explicit or implicit intent to submit to class arbitration." *Jock*, 646 F.3d at 120.

Here, neither party expressly contemplated the issue of class arbitration nor is there a *Stolt–Nielsen*–like stipulation on the matter. *Stolt–Nielsen* "reaffirmed the basic precept of the FAA, that 'arbitration is a matter of consent, not coercion'" and that "courts and arbitrators must 'give ef-

fect to the contractual rights and expectations of the parties.'" *Id.* at 127 (citing *Stolt–Nielsen,* 130 S.Ct. at 1773–74). Thus, while the DR Policy and the DRA made no reference to class arbitration, which the Petitioner repeatedly state in their briefs, more significantly, there was no evidence of any agreement as to that issue. Without such an agreement as to the parties' intent, and "where that agreement contains what is argued to be an implicit agreement to submit to class arbitration," the Arbitrator was free to "look to state law principles of contract interpretation in order to divine whether such intent exists." *Id.* at 126.

As emphasized in the Award, the Arbitrator did not predicate her decision "upon any alleged silence in the DR Policy or the DRA regarding class actions." (Award at 10). "Rather, it is based on what *is* stated in the DR Policy, namely, that an employee can bring "all claims" arising out of his/her employment (except workers' compensation or unemployment claims) and that the Arbitrator '*will* decide all claims according to law, [and] may award *all damages and relief* allowed by law ...'" (*Id.*) (emphasis added in original). Thus, like in *Jock,* the Arbitrator here examined the terms of the arbitration agreement and found "the presence of a very broadly worded arbitration provision." (*Id.*) The Arbitrator found no mutual waiver in the Agreement and reasoned that "[s]ince class action relief is clearly allowed under the New York Labor Law and collective action relief is authorized under the FLSA, ... the DR Policy and the DRA permit a claim to proceed as a class or collective action." (*Id.* at 11).

In addition, to argue against the Award, the Petitioners now rehash several arguments that they previously presented to the Arbitrator. Having found that the parties agreed to submit the class arbitration issue to the Arbitrator, this Court's review of these arguments is limited. *See ReliaStar,* 564 F.3d at 86. Under the standard for vacatur under the FAA, the Award will stand "as long as the arbitrator offers a barely colorable justification for the outcome reached." *Id.* Petitioners' "must clear a high hurdle" that shows more than that "error—or even serious error" by the Arbitrator, but that she "dispense[d her] own brand of industrial justice." *Stolt–Nielsen,* 130 S.Ct. at 1767.

Here, the Petitioners contend that the Arbitrator misinterprets the DRA and DR Policy phrase "any claim" and the provision that the Arbitrator "may award all damages and relief allowed by law" to support her Award. (Pet. Memo at 12–17). Petitioners argue that the "Arbitrator's reliance on this language is misplaced because, when read within the context of the DRA and the DR Policy, the phrase "any claim" clearly refers to substantive claims and not matters of procedure," (*Id.* at 12). In addition, the Petitioners assert that the Arbitrator "incorrectly reasons that Individual Respondents have a 'statutory right' to seek 'relief' on a class or collective basis under the NYLL and FLSA" based on the "all damages and relief" language. (*Id.* at 15 (citing Award at 13–14, 18–19)).

In the Award, the Arbitrator specifically addressed both of the Petitioners' arguments. First, as to the Petitioners' contention that "any claim" refers only to substantive claims, the Arbitrator addressed and found that argument to be "disingenuous," stating that "when procedural matters are inextricably intertwined with the merits of a case, the artificial distinctions between procedural and substantive claims must take a back seat to the larger question whether the parties agreed to arbitration these claims." (Award at 24–25). In addition, she noted

that the arbitration agreement was sufficiently "broadly worded," a distinction made by the Second Circuit in *Jock*, to empower the arbitrator to "award all damages and relief allowed by law." (*Id.* at 23). In her judgment, the language of the DRA and the DR Policy "contemplate the Arbitrator having broad authority to afford the full range of remedies available at law," which in turn "[t]he Arbitrator construes that to include the right to file claims on behalf of a class." (*Id.* at 20–21).

The Arbitrator also noted that "the case law in this jurisdiction holds that a class or collective action waiver should be found only when it is clear that such a waiver was the mutual intent of both parties or, at minimum, the intent of the drafter." (*Id.* at 21). Having found "no such clear, knowing waiver present in this case[,]" the Arbitrator declined to follow, as the Petitioners urged then and now, the holding in *LaVoice v. UBS Financial Servs, Inc.*, No. 11–2308(BSJ)(JLC), 2012 WL 124590 (S.D.N.Y. Jan. 13, 2012).

In *LaVoice*, the plaintiff commenced a class and collective action in the Southern District of New York alleging that the defendant UBS had violated the FLSA and NYLL. *Id.* at *1. UBS filed a motion to compel on the grounds that the plaintiff was a party to an arbitration agreement with UBS pursuant to which he agreed to individually arbitrate his FLSA and NYLL claims. *Id.* Like the Respondents here, the plaintiff countered that the right to proceed on a collective basis under the FLSA is a federal statutory right that cannot be waived, and thus the parties' arbitration agreement was unenforceable. *Id.* at *6. The Court rejected the plaintiff's

argument as being precluded by the Supreme Court's decision in *Concepcion*. *Id.*

Notably, the *LaVoice* decision declined to follow this Court's holding in *Raniere v. Citigroup Inc.*, 827 F.Supp.2d 294 (S.D.N.Y.2011), which held that the right to proceed collectively under the FLSA cannot be waived. In *Raniere*, this Court invalidated an arbitration agreement attached to an employee handbook that required individual arbitration of employment-related claims, stating that:

> There are good reasons to hold that a waiver of the right to proceed collectively under the FLSA is per se unenforceable- and different in kind from waivers of the right to proceed as a class under Rule 23. Collective actions under the FLSA are a unique animal. Unlike employment-discrimination class suits under Title VII of the Americans with Disabilities Act that are governed by Rule 23, Congress created a unique form of collective actions for minimum-wage and overtime pay claims brought under the FLSA.

*Id.* at 311. Accordingly, this Court cannot find, as the Petitioners contend, that the Respondents do not have statutory right to proceed as a class under the FLSA.

In addition, the Arbitrator considered both cases, disagreed with *LaVoice's* holding, and found that the case to be distinguishable from the instant facts. (Award at 21). The dispute resolution clauses in *LaVoice* and *Raniere* "clearly apprised the signatories that they could not bring any class or collective claims" through the explicit class action waiver.[2] (*Id.*). Absent

---

2. The Arbitrator noted that, "[o]f critical importance, the arbitration agreement in *LaVoice* stated, 'By agreeing to the terms of this Compensation Plan ... you waive any right to commence, be a party to or an actual or putative class member of any class or collec-

tive action arising out of or relating to your employment with UBS ....' " (Award at 21). In addition, the binding arbitration clause in *Raniere* stated, "The Policy makes arbitration the required and exclusive forum for the reso-

an explicit class action waiver, the Arbitrator reasoned that the employees "had no way of knowing that the DR Policy would be construed by the Respondents to preclude class or collective actions." (*Id.*).

The Arbitrator's reasoning does not, contrary to the Petitioners' assertion, require "the DRA and DR Policy to have an express waiver of class/ collective claims proceedings." (Pet. Memo at 17). Instead, the Arbitrator first discussed *In re American Express Merchants' Litig.*, in which the Second Circuit concluded that a class action waiver was unenforceable because the plaintiffs had demonstrated that they otherwise would not be able to vindicate their statutory rights "in *either* an individual or collective capacity." 554 F.3d 300, 314 (2d Cir.2009) (emphasis in original). The Court reasoned that due to the great expense of pursuing the litigation and the small individual recovery each plaintiff could expect, the waiver would have the practical effect of ensuring that no claims would be brought at all, granting the defendant "de facto immunity from . . . liability." *Id.* at 320.

After the Supreme Court vacated the decision and remanded it for reconsideration in light of *Stolt–Nielsen,* the Circuit again found that the arbitration provision was unenforceable because "the class action waiver in this case precludes plaintiffs from enforcing their statutory rights" due to the prohibitive cost of litigating on an individual basis. *In re American Express Merchants' Litigation,* 634 F.3d 187, 197–

99 (2d Cir.2011) ("*AMEX II*"). Shortly after the *AMEX II* decision, the case was remanded again in light of the Supreme Court decision in *Concepcion.* Again, the Circuit held that such a class action waiver was unenforceable as it effectively deprived "plaintiffs of the statutory protections of the antitrust law." *In re American Express Merchants' Litig.,* 667 F.3d 204, 217 (2d Cir.2012), pet. for reh'g en banc denied ("*AMEX III*").

As explained in the Award, the Arbitrator found "the Second Circuit's reasoning in all three AMEX cases to be significant to the instant dispute." (Award at 18). Similar to the AMEX plaintiffs, who sought to enforce their statutory rights under the antitrust statutes, the Respondents here "seek to enforce their statutory rights under the FLSA and NYLL." (*Id.* at 19). Applying this Court's decision in *Raniere,*[3] the Arbitrator found it "even more compelling to conclude in the instant case that a class action waiver in an FLSA and NYLL case should not be construed from a dispute resolution clause that does not expressly contain such a waiver, nor does the clause contain language from which such a waiver logically would be inferred." (*Id.* at 20). Thus, the Arbitrator did not require the DRA and DR Policy to have an express waiver, but stated that those Agreements and supporting case law analysis "contemplate the Arbitrator having broad authority to afford the full range of remedies available at law . . .

---

lution of all disputes . . . Claims covered under this Policy must be brought on an individual basis. Neither Citi nor any employee may submit a class, collective, or representative action for resolution under this Policy."
827 F.Supp.2d at 304.

**3.** The Arbitrator also cited to *Sutherland v. Ernst & Young LLP,* in which the Court declined to grant reconsideration of its prior order which refused to compel arbitration

where the arbitration agreement contained a class action waiver. 768 F.Supp.2d 547 (S.D.N.Y.2011). In denying reconsideration, the Court reaffirmed its decision that an employee with an FLSA claim of unpaid overtime wages would be denied an opportunity to vindicate her statutory rights if the class action waiver were enforced. *See Sutherland v. Ernst & Young,* 847 F.Supp.2d 528 (S.D.N.Y.2012).

includ[ing] the right to file claims on behalf of a class." (*Id.* at 20–21).

For the reasons stated above, the Arbitrator did not exceed her powers.

### VI. The Arbitrator Did Not Act in Manifest Disregard of the Law

A court's review under the doctrine of manifest disregard is "severely limited." *Gov't of India v. Cargill Inc.*, 867 F.2d 130, 133 (2d Cir.1989). "It is highly deferential to the arbitral award and obtaining judicial relief for arbitrators' manifest disregard of the law is rare." *Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S*, 333 F.3d 383, 389 (2d Cir.2003). Thus, an arbitral award may be vacated for manifest disregard of the law only where "the arbitrator knew of the relevant [legal] principle, appreciated that this principle controlled the outcome of the disputed issue, and nonetheless willfully flouted the governing law by refusing to apply it." *Westerbeke*, 304 F.3d at 217.

The Petitioners argue that "the Arbitrator ignored a number of well-supported legal arguments all of which were brought to the Arbitrator's attention prior to the issuance of the Award and mandate that Individual Respondents be required to proceed on an individual basis." (Pet. Memo at 7). The Respondents reply that "[t]he law, and each of Petitioners' legal arguments, most of which have been rehashed in Petitioners' motion to vacate, were carefully considered and addressed by Arbitrator Weinstock." (Resp. Opp. at 6).

As discussed above, the Arbitrator did not refuse or ignore the relevant legal principles. In fact, the record suggests that the Arbitrator, only "[a]fter reviewing more than eighty pages in legal memoranda, plus supporting documents" as well as interpreting and distinguishing several cases, issued the Award explaining why class action was not barred. (*Id.*). For example, in distinguishing *Stolt–Nielsen*, the Arbitrator explained that "those facts are markedly different and fully distinguishable from the facts of this case," and the Award went on to analyze the language of the Agreement to provide further support for the distinction between the cases. *See L'Objet, LLC v. Samy D. Ltd.*, No. 11–3856(LBS), 2011 WL 4528297, at *3 (S.D.N.Y., Sept. 29, 2011) (finding no manifest disregard where "[a]ll evidence indicates that the arbitrator provided a carefully reasoned decision explaining why *Dastar* [*Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003)] does not apply to the facts of this case."). While the Petitioners may disagree with the Arbitrator's conclusion, that is an argument on the merits and does not rise to one of the "exceedingly rare instances where some egregious impropriety of the arbitrator is apparent." *Duferco*, 333 F.3d at 389.

Moreover, even if the Award "were factually or legally erroneous, such error would not constitute manifest disregard for clearly applicable law." *Possehl, Inc. v. Shanghai Hia Xing Shipping*, No. 00–557(RWS), 2001 WL 214234, at *6 (S.D.N.Y. Mar. 1, 2001); *see also L'Objet*, 2011 WL 4528297, at *3 (quoting *Carte Blanche (Singapore) Pte., Ltd. v. Carte Blanche Int'l, Ltd.*, 888 F.2d 260, 265 (2d Cir.1989)) (stating that "we are not at liberty to set aside an arbitrat[or's] award because of an arguable difference regarding the meaning and applicability of laws urged upon it.").

Accordingly, the Petitioner fails to demonstrated that the Award exhibits or that the Arbitrator acted in manifest disregard for the law.

### VII. Conclusion

In sum, the Arbitrator's 29 page Award was "based upon a careful analysis of the

DRA and DR policy as required by the now growing body of case law on the issue of class action arbitrations." (Award at 11). The Arbitrator did not so stray from the "interpretation and application of the agreement" sufficient to have dispensed her "own brand of industrial justice" to exceed her powers nor exhibited a manifest disregard for the law. *See Stolt–Nielsen*, 130 S.Ct. at 1767. She demonstrated an understanding of, addressed and applied or distinguished where appropriate the relevant case law, including, among others, the *Bazzle, Stolt–Nielsen*, and *Jock* line of cases, to the question presented before her. Because there exists a more than colorable basis for the Award, the Court finds the Petitioners have failed to meet their considerable burden.

Upon the facts and conclusions set forth above, the petition to vacate the Award is denied and the Award is confirmed.

It is so ordered.